UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TERRELL L. CHAPMAN                                    CIVIL ACTION

VERSUS                                                NUMBER: 16-13034

CORRECT CARE SOLUTIONS, <u>ET</u> <u>AL</u>.                   SECTION: "I"(5)

### <u>REPORT AND RECOMMENDATION</u>

Presently before the Court is the Rule 12(b)(6) motion to dismiss of Defendant, Correct Care Solutions, LLC ("CCS"). (Rec. doc. 14). Plaintiff has filed no memorandum in opposition to Defendant's motion.[1] Also before the Court, pursuant to a previous order issued in furtherance of statutory screening under 28 U.S.C. §1915A, are the records documenting the medical care that was provided to Plaintiff at his present place of confinement, the Orleans Justice Center ("OJC"). (Rec. doc. 15). For the reasons that follow, it is recommended that Defendant's motion be granted and that Plaintiff's lawsuit otherwise be dismissed as frivolous pursuant to 28 U.S.C. §§1915A and 1915(e)(2)(B)(i).

Terrell L. Chapman, Plaintiff herein, was an inmate of the OJC at the time that he drafted his complaint following his arrest on gun-related charges on January 13, 2016. (Rec. doc. 1, p. 3).[2] Plaintiff brought this 42 U.S.C. §1983 proceeding against Defendants, CCS and Sheriff Marlin N. Gusman, regarding the adequacy of the medical care he received OJC.

---

[1] As Plaintiff has filed no memorandum in response to Defendant's motion, timely or otherwise, the Court may properly assume that he has no opposition to it. *Johnson v. Colvin*, No. 14-CV-0401, 2014 WL 4186790 at *1 n. 1 (E.D. La. Aug. 22, 2014)(citing Local Rule 7.5 and *Bean v. Barnhart*, 473 F.Supp.2d 739, 741 (E.D. Tex. 2007)); *Jones v. Larpenter*, No. 13-CV-0056, 2013 WL 1947243 at *1 n. 1 (E.D. La. Apr. 12, 2013), *adopted*, 2013 WL 1947188 (E.D. La. May 10, 2013)(same); *Lucas v. Crowe*, No. 11-CV-2752, 2013 WL 870514 at *1 n. 1 (E.D. La. Feb. 15, 2013), *adopted*, 2013 WL 870437 (E.D. La. Mar. 7, 2013)(same).

[2] It appears that Plaintiff may have been transferred to a different jail facility as court-generated mail that was sent to him at OJC was recently returned as undeliverable. (Rec. doc. 13).

Plaintiff first explains that he is paralyzed from the waist down and is "medicated to" Gabapentin, Oxycodone, and Baclofen but was not provided any medication until "around 2/15/16." (*Id.* at p. 4). Plaintiff further explains that as a result of his physical condition, he is required to catheterize himself three to four times per day and that at some point he developed a bladder infection but was not routed to the hospital for an evaluation of his renal functioning. (*Id.*). Plaintiff additionally alleges that on June 18, 2016, he fell and injured his leg as a result of being housed in a less-than-suitable cell and was never taken to the hospital for x-ray studies. (*Id.*). As of the date that he signed his complaint, July 14, 2016, Plaintiff asserts that he has still not received "proper medical treatment" and that he is a "c[h]ronic patient" but has yet to receive any pain medication. (*Id.*). For the pain and suffering that he has endured, Plaintiff seeks $1,700,000 in damages. (*Id.* at p. 5).

By way of its present motion, CCS argues that Plaintiff's claim against it is essentially grounded in principles of *respondeat superior* which is inapplicable to §1983 proceedings. (Rec. doc. 14-1, p. 3). CCS further argues that Plaintiff's allegations are otherwise insufficient to establish deliberate indifference under §1983. (*Id.* at pp. 3-4). As noted earlier, Plaintiff has not controverted the arguments advanced by CCS.

It is axiomatic that in order to be held liable under §1983, a person must either be personally involved in the acts causing the alleged deprivation of an individual's constitutional rights, or there must be a causal connection between the act of that person and the constitutional violation sought to be redressed. *Phillips v. Corr. Corp. of America*, No. 02-CV-0766, 2006 WL 1308142 at *2 (W.D. La. May 10, 2006)(citing *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)). Supervisory officials like the Sheriff cannot be held liable under §1983 for the actions of their subordinates on any theory of vicarious liability. *Id.*

Only the direct acts or omissions of governmental officials, not the acts of subordinates, will give rise to individual liability under §1983. *Id.* (citing *Coleman v. Houston Indep. Sch Dist.*, 113 F.3d 528, 534 (5th Cir. 1997)). Governmental officials may, however, be liable when the enforcement of a policy or practice results in the deprivation of an individual's federally protected rights. *Id.* (citing *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215-16 (5th Cir. 1998)).

Just as a municipal entity or supervisory official cannot be held vicariously liable for the actions of subordinates under a theory of *respondeat superior*, so is a private corporation like CCS not vicariously liable under §1983 for its employees' deprivations of others' civil rights. *Alfred v. Corr. Corp. of America*, No. 08-CV-0643, 2009 WL 789649 at *2 (W.D. La. Mar. 24, 2009); *Phillips*, 2006 WL 1308142 at *3. To the extent that a prisoner's claim of liability against a private corporation performing a governmental function is based only upon the actions of the corporation's employees, "... any such claim fails as a matter of law." *Phillips*, 2006 WL 1308142 at *3 (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), *cert. denied*, 534 U.S. 820, 122 S.Ct. 53 (2001)).

In light of the foregoing authorities, it is clear that CCS cannot be held liable under §1983 on either theory of *respondeat superior* or vicarious liability. *Parker v. Gusman*, No. 16-CV-01609, 2016 WL 7167938 at *5 (E.D. La. Nov. 18, 2016), *adopted*, 2016 WL 7156076 (E.D. La. Dec. 7, 2016); *Frazier v. Corr. Corp. of America*, No. 12-CV-0952, 2012 WL 6849734 at *2 (W.D. La. Nov. 1, 2012), *adopted*, 2013 WL 144040 (W.D. La. Jan. 11, 2013). Absent any allegations that an official policy or custom of CCS was the "moving force" behind its employees' alleged deprivation of Plaintiff's civil rights, there is simply no valid basis upon which to hold CCS liable here. *Parker*, 2016 WL 7167938 at *5; *Frazier*, 2012 WL 6849734

at *2; *Alfred*, 2009 WL 789649 at *2.  Similarly, as Plaintiff's claim against Sheriff Gusman is also premised on *respondeat superior*, that claim should be dismissed as frivolous under §§1915(e)(2)(B)(i) and 1915A as being based upon an indisputably meritless legal theory. *Booker v. Koonce*, 2 F.3d 114, 116 (5th Cir. 1993)(respondeat superior is an indisputably meritless legal theory); *Alfred*, 2009 WL 789649 at *2.  However as will be discussed below, even if that were not the case, based upon a review of the voluminous medical records that have been provided to the Court, no credible claim of deliberate indifference lies here.

As noted earlier, the Court previously issued an order in this matter directing that Plaintiff be evaluated by an OJC physician and that he be provided with such treatment as was reasonably recommended by the doctor.  (Rec. doc. 6).  A copy of the physician's report detailing the results of the evaluation as well as a copy of Plaintiff's OJC medical records were thereafter to be provided to the Court and to Plaintiff himself.  (*Id.*).  The Court has since been furnished with the voluminous records documenting Plaintiff's treatment at the OJC.  (Rec. doc. 15).[3/]  A discussion of the medical records pertinent to the resolution of the matter at hand follows.

Upon Plaintiff's processing into OJC on January 13, 2016, he was subjected to a medical intake screening by a licensed practical nurse who elicited and documented relevant information, including Plaintiff's wheelchair-bound status as a result of a gunshot wound in July of 2015.  Plaintiff advised the nurse that the medications that he was taking at the time included Neurontin, Oxycodone, and a stool softener.  He was referred to the medical

---

[3/] Included in those records are some which document Plaintiff's treatment at the University Medical Center in New Orleans in October and December of 2015 for such matters as back pain and a urinary tract infection. Presumably, those records were obtained by OJC medical personnel subsequent to Plaintiff's arrest in January of 2016 to assist them in fashioning a treatment plan for him.

4

provider, CCS, for initial evaluation of his gunshot wound and was assigned to the handicap tier.  Pursuant to a duly-executed authorization for the release of medical information, the nurse verified from a local pharmacist that Plaintiff had previously been prescribed Gabapentin, Baclofen, Vistoril, Elavil, Zantac, and Robaxin.  On that same day, a physician ordered prescriptions for Gabapentin, Baclofen, and Mylanta and Plaintiff was scheduled for an initial evaluation of his gunshot wound the following morning.  On January 14, 2016, Plaintiff was administered a dosage of Neurontin by OJC medical personnel.  Various diagnostic tests were ordered and Plaintiff's medications were adjusted to discontinue Baclofen, increase Cymbalta, and to add Ultram.  A "special needs communication form" indicates that Plaintiff was assigned to a bottom bunk in the acute psychiatric unit.

On January 15, 2016, Plaintiff had an "acute care visit" to the CCS clinic where he was assessed with paraplegia secondary to a gunshot wound, a neurogenic bladder, constipation, hemorrhoids, and spasticity.  Plaintiff was continued on Neurontin and Colace and Preparation H cream was prescribed.  A "push up" to his wheelchair was also ordered to prevent the onset of pressure sores as were sterile catheters and further testing with follow-up was scheduled for two weeks thereafter.  The medical records also contain a "Refusal of Treatment" form that was signed by Plaintiff on January 15, 2016 in which he declined a history and physical assessment.  The form further reflects that Plaintiff was advised to keep his then-pending clinic appointment and was to submit sick-call requests as needed.

On January 20, 2016, Plaintiff submitted a "Healthcare Request" form in which he complained of a bladder infection and resulting pain.  Plaintiff was seen by a registered nurse that very day who noted his complaints of constipation and abnormal urine.  A CCS physician issued verbal orders for a urinalysis and Plaintiff was placed on the provider list to be seen

at the clinic the following day.  As ordered, urinalysis was conducted on January 21, 2016 which revealed several abnormalities.  Plaintiff was next seen January 25, 2016 by a nurse practitioner, who recommended a 10-day course of Bactrim.  A physician ordered the suggested antibiotic that same day and Plaintiff was to return in seven days to evaluate his response to the medication.

On January 27, 2016, further urinalysis was conducted, as was bloodwork.  Plaintiff was next seen at the clinic on February 3, 2016 and was assessed with paraplegia with a neurogenic bladder, severe spasticity with foot drop, and hemorrhoids.  Liver function studies were to be scheduled and the dosage of Baclofen was adjusted.  Preparation H cream was also prescribed.  Hepatic function studies were performed on February 8, 2016.  A formulary exception request was made on February 11, 2016 to provide Plaintiff with the dosage of Baclofen that his condition required.  A further formulary exception request was ordered and made on February 15, 2016 to provide Plaintiff with a 60-day supply of Neurontin.  On March 1, 2016, Plaintiff submitted another "Healthcare Request" form complaining of pain upon urination.  Additional Bactrim was ordered for him on that date.

Further urinalysis studies were conducted on March 2, 2016 and only one abnormality was noted.  Plaintiff was then seen at the clinic by Dr. Nguyen on March 8, 2016 for complaints of burning on urination which by then had resolved with the prescribed Bactrim.  The assessment was paraplegia secondary to a gunshot wound with spinal cord injury spasticity, a neurogenic bladder, and a urinary tract infection.  Plaintiff was prescribed a ten-day supply of Tylenol 650 and was to be re-evaluated in one month.

On March 18, 2016, Plaintiff was seen by a nurse in connection with an onset of chest pain earlier that day.  The assessment was atypical chest pain and no treatment was

administered as by that time the condition had resolved.  Plaintiff was next seen at the clinic on March 20, 2016 for urinary complaints of three days' duration.  It was noted at that time that lab work was pending.  Plaintiff presented to the clinic again on March 29, 2016 with the assistance of a deputy complaining of symptoms of a urinary tract infection.  Two "Healthcare Request" forms, one from Plaintiff and another one completed on his behalf, were submitted on that date in connection with his ongoing urinary difficulties.  Escorted by a deputy, Plaintiff was seen at the clinic the following day for complaints of chest pain and symptoms of a urinary tract infection.  An EKG was performed by Dr. Nguyen who also prescribed Tylenol for pain relief.  The attending nurse characterized Plaintiff's urinary complaints as routine, non-emergent, and non-urgent.

Additional urinalysis was conducted on April 1, 2016 along with a "Chronic Care" periodic exam/follow-up visit with Dr. Nguyen.  The assessment was paraplegia secondary to a gunshot wound with spinal cord injury, neurogenic bladder, and a urinary tract infection.  Courses of Macrobid and Baclofen were prescribed along with Tylenol 650 for pain relief.  Colace was prescribed on April 4, 2016 to be used as needed.  Pursuant to a sick-call request of April 12, 2016, Plaintiff was seen again at the clinic the following day for complaints of back pain, stating that his regimen of Baclofen, Neurontin and Tylenol relieved his pain for only a short time.  Plaintiff was educated on other therapeutic techniques to address his discomfort.  On April 19, 2016, Plaintiff submitted yet another sick-call request, requesting a refill on his Gabapentin as he was said to be experiencing severe pain and further urinary difficulties.  He was seen by the nurse the following day and his problems were found to be non-emergent.   A further evaluation was scheduled for April 22, 2016 and Plaintiff's Neurontin prescription was refilled.

Plaintiff was seen again by Dr. Nguyen on April 22, 2016 and was prescribed Flexeril, Bactrim DS, Gabapentin, and Preparation H, with a formulary exception request being submitted in connection with the Gabapentin.  By April 25, 2016, Plaintiff reported that the Bactrim was not adequately addressing his urinary complaints.  He submitted another sick-call request form to that effect on April 27, 2015 and was seen in the clinic the following day by both a registered nurse and a nurse practitioner.  In an effort to better bring his urinary complaints under control, Plaintiff was prescribed a cocktail of Bactrim DS, Augmentin, and Pyridium with the hope that his symptoms would resolve in seven days.  A further acute-care clinic visit went forward on April 30, 2016 and the assessment was rule out a urinary tract infection versus renal stones.  Additional Pyridium and Augmentin was prescribed.

On May 2, 2016, Plaintiff underwent further urinalysis which revealed two abnormalities but no bacteria.  He was advised of the lab results during a clinic visit the following day.  On May 6, 2016, Plaintiff submitted another sick-call request form, essentially reporting that his supply of prescribed antibiotics had been depleted.  He was seen in the clinic that same day and labwork was noted to be pending.  Yet another urinalysis was conducted on May 18, 2016 with several abnormalities being documented.

Plaintiff underwent a further chronic care periodic exam/follow-up visit at the hands of Dr. Nguyen on May 19, 2016 and was prescribed Flexeril and was counseled on pain relief measures.  On May 25, 2016, Plaintiff submitted another "Healthcare Request" form complaining of ongoing urinary complaints.  He was seen in the clinic twice on the following day and additional testing was scheduled.  On May 27, 2016, Plaintiff had yet another acute care clinic visit during which he complained of pain upon urination and malodorous urine. The assessment was paraplegia with a neurogenic bladder and a urinary tract infection.

Plaintiff was prescribed additional Bactrim DS and was educated on sterile catheterization techniques.

On May 30, 2016, Plaintiff submitted another sick-call request form complaining of ongoing urinary symptoms. He was seen at the clinic the following day and the visit was characterized as routine. During a further acute-care clinic visit on June 2, 2016, Plaintiff was prescribed Cipro, Baclofen, and Flexeril. Repeat urinalysis was to be performed in 10 days and Plaintiff was to return to the clinic in 14 days.

Plaintiff was next seen at the clinic on June 3, 2016 after reportedly falling while transferring himself from his wheelchair to his bottom bunk, landing on his left side and injuring his left hip. Upon physical examination, Plaintiff had a full range of motion in the left hip/knee with no swelling, bruises, unusual protrusions, or redness. When asked to remove his shoe, Plaintiff was observed to pull his leg up to his chest and to remove his sock and shoe with no sign of discomfort. Plaintiff returned to the clinic on June 8, 2016 with complaints of pain under the left arm but he was able to propel himself in his wheelchair without apparent difficulty.

A further acute care clinic visit went forward on June 14, 2016 with attending physician Dr. Herman Gonzales. Plaintiff reported that his urinary symptoms were better but not completely resolved so a change in antibiotics was to be made. Further urinalysis was conducted on June 15, 2016 which demonstrated several abnormalities. In light of those findings, Nitrofurantoin was prescribed on June 17, 2016. On June 19, 2016, Plaintiff refused the Macrobid that had been prescribed to him, stating that he "didn't want it." He even refused to sign the "Refusal of Treatment" form documenting his declination. Plaintiff similarly refused a blood pressure check on June 20, 2016.

9

On June 22, 2016, Plaintiff reported striking his left knee on his bed while transferring to or from his wheelchair. Plaintiff was treated by the wound-care nurse for a laceration on his left leg and a scab was noted on the left knee. On June 25, 2016, Plaintiff completed another sick call request form asking to see the OJC Medical Director, Dr. Kennedy, regarding an unidentified, yet serious, problem. He underwent routine triage on June 25, 2016 and was seen in the clinic the following day for routine intervention with respect to that condition.

On June 27, 2016, Plaintiff expressed suicidal ideations and was accordingly placed on suicide watch. By June 28, 2016, Plaintiff's psychiatric condition had moderated and he was moved off suicide watch with follow-up monitoring to occur. On June 29, 2016, Plaintiff advised medical personnel that he was "alright" with no suicidal ideations, a healthy appetite, restful sleep, and no problems with concentration. Stress management was discussed. The following day, Plaintiff refused his prescribed dosage of Neurontin, providing no reason therefor. He also underwent a general health evaluation as well as post suicide watch follow-up by a social worker. Further follow-up occurred on July 5, 2016 which was normal.

On July 11, 2016, Plaintiff refused a blood-pressure check, also declining to sign the "Refusal of Treatment' form. Six days later, he similarly refused his doses of Baclofen and Gabapentin. Further urinalysis was performed on July 18, 2016 which yielded normal results. Plaintiff was seen by Dr. Nguyen that day who noted that he consistently requested antibiotics for a bladder infection even though such a need was not established through objective testing. Plaintiff was prescribed Colace and Preparation H and was to be provided with high ankle support shoes from home. Dr. Nguyen performed a further chronic care periodic exam/follow-up evaluation and it was noted that the most recent urinalysis had

produced normal results. Plaintiff was to continue on his medication regimen and was to be re-evaluated in two months.

On July 27, 2016, Plaintiff reported falling off the lavatory while transferring to his wheelchair. Despite Plaintiff's complaint of pain under his left arm, no injury was noted. At the direction of Dr. Nguyen, Plaintiff was prescribed Ibuprofen for pain relief. On July 30, 2016, Plaintiff refused his dosage of Colace, explaining that he did not need it but refusing to sign the declination form. He similarly refused the Colace again on July 31, 2016.

Plaintiff was seen again by Dr. Nguyen on August 2, 2016 in connection with his recent fall. X-rays of the left ribs were ordered which produced no acute findings. Plaintiff returned to the clinic on August 15, 2016 to obtain the x-ray results and to arrange for a tapering of his Neurontin. In light of his complaints of back pain, an x-ray of the thoracic spine was ordered. Dr. Nguyen issued the order to taper the dosage of Plaintiff's Neurontin on August 19, 2016. Plaintiff refused his allotment of Gabapentin on August 21, 2016 and declined to sign the refusal form. X-ray studies of the thoracic spine were performed which demonstrated unremarkable findings.

On August 23, 2016, Plaintiff submitted a sick-call request form complaining of a possible urinary tract infection and a spike in his blood pressure with dizziness. Plaintiff was seen in the clinic that very day, urinalysis was performed the following day, and he was prescribed Baclofen, Bactrim, Cymbalta, and a tapering dose of Neurontin following further evaluation. Plaintiff was subsequently re-evaluated by Dr. Nguyen for the residuals resulting from his gunshot wound and was prescribed Tylenol 650 for pain relief. On September 6, 2016, Plaintiff executed a new form authorizing the release of his medical records from the University Medical Center and Dr. Nguyen updated Plaintiff's treatment plan.

Plaintiff was unable to be seen at the clinic on September 9, 2016, as his chart was unavailable, and the appointment was rescheduled.  The following day, Plaintiff refused offered care for a wound to his mid-back and declined to sign the refusal form.  He also refused his dosages of Tylenol, Baclofen, and Cymbalta.  By September 12, 2016, Plaintiff's wound had healed.  A 10-day supply of Tylenol was prescribed that day following an acute care visit to Dr. Nguyen and Plaintiff was to return to the clinic in one month.  Wound care was formally discontinued by Dr. Nguyen on September 13, 2016.  Plaintiff refused his blood pressure medication on September 14, 2016.

On September 15, 2016, Plaintiff submitted another "Healthcare Request" form requesting an x-ray of his left foot which he suspected may have come out of place when he was putting his shoes on.  Plaintiff was seen in the clinic that very day during which he also reported having fallen off the toilet three weeks earlier.  He refused his prescribed dosages of Tylenol, Baclofen, and Cymbalta on September 19, 2016, declining to sign the declination form.  A blood pressure check was similarly refused in the early morning hours of September 21, 2016.  Later that day, Plaintiff underwent a thorough chronic-care assessment by Dr. Nguyen in connection with his multiple medical problems, namely, paraplegia secondary to a gunshot wound, a neurogenic bladder, constipation, left shoulder pain, and chronic pain from a bullet fragment.  Plaintiff expressed anger that the Neurontin had been discontinued per CCS protocol and he demanded Tramadol in its place.  Plaintiff was prescribed Colace, Dulcolax, Mobic, and K-Gel for catheter insertion and an x-ray of his foot was to be scheduled. He subsequently refused an in-and-out catheter, reportedly stating that "I don't want it, if I can't have my Gabapentin."  X-rays of Plaintiff's left foot were taken the following day which

revealed no acute skeletal abnormality but questionable bursitis at the medial head of the first metatarsal.

Plaintiff refused another blood-pressure check on September 28, 2016 but he did on this occasion sign the appropriate form acknowledging his refusal.  He subsequently refused offered doses of Baclofen, Dulcolax, Duloxetine, and Meloxicam on October 2, 2016 and Baclofen, Dulcolax, Colace, Cymbalta, and Mobic on October 3, 2016.  On October 5, 2016 Plaintiff complained of pain upon urination and cloudy urine.  He was thus prescribed a 10-day course of Bactrim and Ibuprofen for pain relief.  Additional urinalysis was to be conducted, Plaintiff was to be transferred to the medical tier, and he was to return to the clinic in several days to obtain the lab results.

The final treatment records document Plaintiff's evaluation by Dr. Kennedy on October 7, 2016 pursuant to the Court's previous order.  Plaintiff's various medical conditions were discussed and a mutually agreeable treatment plan was arrived at to address his urinary tract and chronic non-cancer pain concerns.  Bactrim was discontinued and Macrodantin was prescribed in addition to Ultram.  Further testing was scheduled as was a follow-up appointment for October 21, 2016 to discuss the efficacy of the new treatment plan.

It is against the backdrop of the foregoing medical records, upon which the Court may properly rely, *Gobert v. Caldwell*, 463 F.3d 339, 346 n. 24 (5th Cir. 2006), that the sufficiency of the allegations made by Plaintiff against the named Defendants can be analyzed.[4/]  In order to establish a constitutional violation, Plaintiff must demonstrate that the Defendants were

---

[4/] "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference."  *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain.[5/] *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet, *Gobert*, 463 F.3d at 346, one that has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted). If an inmate in fact receives medical treatment, federal constitutional protections are not violated simply because that treatment was unsuccessful or because pain persists despite the treatment. *Gobert*, 463 F.3d at 345; *Williams v. Chief of Medical Operations, Forrest County Jail*, No. 94-10115, 1994 WL 733493 at *2 (5th Cir. Dec. 27, 1994); *Kron v. Tanner*, No. 10-CV-0518, 2010 WL 3199854 at *7 (E.D. La. May 19, 2010), *adopted*, 2010 WL 3171040 (E.D. La. Aug. 6, 2010). That an inmate's medical care "... may not have been the best money could buy" is insufficient to establish a constitutional violation, *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992), and a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford v. Kelly*, No. 09-CV-0133, 2011 WL 2633034 at *2 (N.D. Miss. June 3, 2011),

---

[5/] This standard is the same for both pre-trial detainees and convicted prisoners. *Hale v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

*adopted*, 2011 WL 2633174 (N.D. Miss. July 5, 2011).  And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also establish that he suffered substantial harm as a result of the delay.  *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010).  "Experiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's … medical records demonstrate that he received treatment."  *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759459 at *4 (W.D. Tex. Feb. 23, 2011)(quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.

Particularly as respects the two specifically named Defendants, the medical records that have been provided to the Court clearly fail to establish the objective and subjective components needed to prevail on a claim of deliberate indifference.  Contrary to the allegations presented in his complaint, Plaintiff's medical condition was thoroughly evaluated by medical personnel upon his admission into the OJC, who ordered various prescription medications that same day.  Neurontin, a nerve pain medication that Plaintiff had been taking prior to his incarceration, was provided to him the day following his arrest and his medication regimen was adjusted further to respond to his needs.  One week following his arrest, he complained of urinary symptoms and was seen in the clinic that very day as well as the next day, with urinalysis confirming the presence of a urinary tract infection and Bactrim being ordered to treat the condition.  Plaintiff's disagreement with the testing that was used to diagnose his bladder infection cannot support a claim under §1983. *Desroche v. Strain*, 507 F.Supp. 2d 571, 583 (E.D. La. 2007)(citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)).  Plaintiff additionally complains that he was not routed to the hospital for x-ray studies after suffering a fall in his cell in June of 2016.  Once again, how OJC

medical personnel chose to diagnose Plaintiff's condition is a matter of medical judgment and a prisoner is not entitled to medical treatment of his choosing simply upon request. *Stafford*, 2011 WL 2633034 at *2.  The contemporaneous medical records also quite easily refute Plaintiff's allegation that he was never provided any pain medication as he was undoubtedly been provided with quantities of Neurontin, Tylenol 650, Flexeril, Ibuprofen, Mobic, and Ultram throughout his stay at the OJC.  In fact, on several occasions Plaintiff refused the very pain relief medications that he now complains of not receiving.  In any event, the decision of which specific medications to prescribe Plaintiff is a classic example of a matter of medical judgment.  *Brauner v. Coody*, 793 F.3d 493, 499 (5th Cir. 2015)(quoting *Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 293 (1976)).

The copious medical records that have been provided to the Court belie any credible claim of deliberate indifference, particularly as respects the two specifically named Defendants. Indeed, the records underscore that Plaintiff's allegations "… address the nature of his treatment and not the lack thereof."  *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).  As observed by the Fifth Circuit, "[c]ontinuing … pain is unpleasant.  Its existence does not, however, in and of itself demonstrate that a constitutional violation occurred." *Mayweather*, 958 F.2d at 91.  In short, the determinative issue here is not whether the medical care that Plaintiff received was substandard in some respect, whether his medical problems or pain persisted, or whether he was dissatisfied with his care; rather, it is only whether his serious medical needs were met with deliberate indifference <u>by</u> <u>the</u> <u>named</u> <u>Defendants</u>.  Based upon a review of the record that is presently before it, the Court easily answers that question in the negative.  Accordingly, it will be recommended that Defendant's

16

motion be granted and that Plaintiff's lawsuit otherwise be dismissed as frivolous pursuant to 28 U.S.C. §§1915A and 1915(e)(2)(B)(i).

### RECOMMENDATION

For the foregoing reasons, it is recommended that Defendant's motion to dismiss be granted and that Plaintiff's lawsuit otherwise be dismissed as frivolous under 28 U.S.C. §§1915A and 1915(e)(2)(B)(i).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[6]

New Orleans, Louisiana, this  19th  day of _____ January _____ 2017.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[6] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.